(C. D. 1844)

PRELOAD CONSTRUCTION CORP.⎱ *v.* UNITED STATES
CARSON M. SIMON & CO. ⎰

United States Customs Court, Second Division

(Decided February 13, 1957)

*Sharretts, Paley & Carter* (*Joseph F. Donohue* of counsel) for the plaintiffs.
*George Cochran Doub*, Assistant Attorney General (*Richard ·M. Kozinn* and *Henry J. O'Neill*, trial attorneys), for the defendant.

Before LAWRENCE, RAO, and FORD, Judges

LAWRENCE, Judge: This cause of action, embracing four protests which were consolidated for trial, relates to merchandise described in the consular invoices as "Silico Manganese Bar Reinforcement for Prestressed Concrete," being 1 inch in diameter by 37 feet, 7 inches in length. The number of bars in each invoice is accompanied by an equal number of "sets" of nuts and washers. The bars are also referred to in the record in more abbreviated form as "Macalloy bars."

The collector of customs apparently treated the bars, nuts, and washers as entireties and classified them as articles of metal upon which duty was assessed at the rate of 22½ per centum ad valorem as provided in paragraph 397 of the Tariff Act of 1930 (19 U. S. C. § 1001, par. 397), as modified by the General Agreement on Tariffs and Trade, 82 Treas. Dec. 305, T. D. 51802.

In their protests as filed, plaintiffs claimed that the subject merchandise should be classified "as all other structural shapes of iron or steel, fabricated for use or otherwise advanced beyond hammering, rolling or casting," and subjected to duty at the rate of 7½ per centum ad valorem in accordance with the terms of paragraph 312 of said act (19 U. S. C. § 1001, par. 312), as modified by the Torquay Protocol to the General Agreement on Tariffs and Trade, 86 Treas. Dec. 121, T. D. 52739.

The protests were later amended to embody the following alternative claims:

1. That the articles described on the invoices as "Nuts and Washers" are dutiable at three-tenths of 1 cent per pound in paragraph 330 of said act (19 U. S. C. § 1001, par. 330), as modified by the General Agreement on Tariffs and Trade, *supra*, as to said items covered by protest 206224–K, and as to the nuts and washers covered by the other three protests (206225–K, 206226–K, and 206227–K) the same claim is made, except that paragraph 330 is referred to as being modified by the Torquay protocol, as supplemented by Presidential notification, 86 Treas. Dec. 265, T. D. 52763 (which latter modification we find contains no reference to paragraph 330 and will be referred to *infra*).

2. That the merchandise described in the motions to amend as "steel reinforcing bars, steel bars, reinforcing bars, and steel plates" should be classified as "concrete reinforcement bars and plates, not specially provided for," in paragraph 304 of said act (19 U. S. C. § 1001, par. 304), as modified by the General Agreement on Tariffs and Trade, T. D. 51802, *supra*, and dutiable at the rate of 15 per centum ad valorem as to the merchandise covered by protest 206224–K; and as to the merchandise covered by the other three protests (206225–K, 206226–K, and 206227–K) the same claim is made except that the rate specified is 12½ per centum ad valorem, pursuant to the Torquay protocol, as supplemented by Presidential notification, T. D. 52763, *supra*.

The text of the competing paragraphs, so far as pertinent here, reads as follows:

Paragraph 397 of the Tariff Act of 1930, as modified by the General Agreement on Tariffs and Trade, *supra*:

Articles or wares not specially provided for, whether partly or wholly manu-
factured:

\*      \*      \*      \*      \*      \*      \*

Composed wholly or in chief value of iron, steel, lead, copper, brass,
nickel, pewter, zinc, aluminum, or other metal (not including platinum,
gold, or silver), but not plated with platinum, gold, or silver, or colored
with gold lacquer:

\*      \*      \*      \*      \*      \*      \*

Other (except slide fasteners and parts thereof)____ 22½% ad val.

Paragraph 312 of said act, as modified by the Torquay Protocol
to the General Agreement on Tariffs and Trade, *supra*:

Beams, girders, joists, angles, channels, car-truck channels, tees, columns and
posts, or parts or sections of columns and posts, and deck and bulb beams,
together with all other structural shapes of iron or steel:

\*      \*      \*      \*      \*      \*      \*

Machined, drilled, punched, assembled, fitted, fabricated
for use, or otherwise advanced beyond hammering, roll-
ing, or casting_____ 7½% ad val.

Paragraph 330 of said act, as modified by said general agreement,
*supra*:

Nuts, \* \* \* and washers, of wrought iron or steel_____ ⁹⁄₁₀¢ per lb.

Paragraph 304 of said act, as modified by said general agreement,
*supra*:

\* \* \* concrete reinforcement bars; \* \* \*:

\*      \*      \*      \*      \*      \*      \*

Valued above 16 cents per pound_____ 15% ad val.

Paragraph 304 of said act, as modified by the Torquay protocol
to said general agreement, as supplemented by Presidential proclama-
tion, *supra*:

\* \* \* concrete reinforcement bars; \* \* \* all the foregoing valued
over 16 cents per pound_____ 12½% ad val.

It is important to quote also the provision of paragraph 304 of said
act, as modified by the Annecy Protocol to the General Agreement on
Tariffs and Trade, 84 Treas. Dec. 403, T. D. 52373, supplemented by
Presidential proclamation, 85 Treas. Dec. 116, T. D. 52462, reading
as follows:

\* \* \* concrete reinforcement bars; \* \* \*:

Valued above 5 and not above 8 cents per pound_____ 12½% ad val.

\*      \*      \*      \*      \*      \*      \*

The following exhibits, which will be referred to *infra* wherever
necessary, were offered by plaintiffs and received in evidence:

Exhibit 1, sample representing the imported bars, except as to
length, with nut attached. One end of the bar, which is threaded, is
called the jacking end; the other end, also threaded, is the same,
except for the length of the threads.

Exhibit 2, photograph showing the size and construction of a completed tank in which such bars were used.

Exhibit 3, photograph depicting a view of a completed tank.

Exhibits 4 and 5, photographs showing other views of portions of a tank.

Exhibit 6, photograph indicating a bar in stress position with a nut run down to the desired position on the threads. A washer is placed on the bottom of the nut, and the top of a bearing plate rests on the concrete.

Exhibit 7, photograph showing a bar in which the anchor plate was set too low, and it was necessary to use a large number of washers in order to maintain the desired stress in the bar.

Exhibit 8, photograph representing a prestressing bar or unit which has been stressed, the nub being turned down to the desired position, and the bar being used as a temporary tie rod for a common reinforcing bar.

Exhibit 9, the front cover of a sketch depicting a schematic diagram of a beam that is made with the use of prestressed steel, the red lines running through the beam representing bars.

Exhibit 10, photograph showing the actual beams that were made with the use of Macalloy steel bars.

Exhibit 11, motion-picture film showing the prestressing principles and certain tests made.

Exhibit 12, booklet entitled "Criteria for Prestressed Concrete Bridges."

Exhibit 13, samples of round and so-called split washers used with reinforcement bars.

Defendant introduced the following exhibits:

Exhibit A, booklet of the American Society for Testing Materials containing specifications for concrete reinforcing bars.

Exhibit B, document containing specifications for the type of steel used in the construction of the bars in controversy and tests made by McCalls Macalloy, Ltd., and by the Bureau of Public Roads, dated June 19, 1953.

This case presents several major questions to be considered in determining the issues before us:

1. Are the bars with the nuts and washers to be considered as entireties, as classified by the collector of customs?

2. Are the bars, with or without the nuts and washers, structural shapes within the purview of paragraph 312?

3. Are the bars, with or without the nuts and washers, concrete reinforcement bars which are enumerated in paragraph 304?

Hearings in this case were held in Philadelphia and in New York City.

At the trial in Philadelphia, two witnesses were called who testified on behalf of the plaintiffs.

The first witness, LeRoy Magers, Jr., stated that he was employed as a development engineer by the Preload Co., Inc., a subsidiary of the Preload Construction Corp., which is engaged in the design and direction of prestressed concrete structures, principally sewage tanks and water reservoirs. He described his duties as "The investigation of any methods of prestressing; any materials with which to accomplish prestressing; miscellaneous development items concerned with improvements to our methods."

Magers examined the condition of the imported merchandise upon its arrival and also inspected the methods by which it was utilized in constructing "the Philadelphia S/W sewage drain," and identified the various photographs above referred to depicting the use of the subject merchandise.

Plaintiffs' second witness was Andrew Tripp, assistant sales manager of the Preload Co., and a graduate engineer, who testified that he supervised the construction of the tanks illustrated in plaintiffs' exhibits 1 through 8. It was agreed by adversary counsel that if Mr. Tripp were asked the same questions on both direct and cross-examination as were asked of Mr. Magers, he would give the same answers.

Magers displayed an intimate knowledge of the character, construction, and utility of the imported merchandise, and his testimony stands unrebutted. The substance of his testimony, which we deem material here, is so well stated in the brief filed by plaintiffs that we adopt it for consideration here.

After stating the dimensions of the bars, the brief states that—

* * * They were used in Philadelphia in the construction of concrete sewage disposal tanks. Their purpose was to apply vertical stress to the walls of the tank and thus to increase the strength of the tank with minimum use of materials. To accomplish this purpose, the bars were placed vertically at 4 foot intervals within the concrete walls of the tank. They were coated with mastic and wrapped in paper to prevent bonding with the concrete. The bar was anchored to the bottom of the tank by appropriate plates and anchor bolts. When they were in place, the concrete was poured in forms to create the walls of the tank. It was allowed to dry. Then an anchor plate and nut were fitted over the bars to the top of the tank. A hydraulic jack engaged the bar at the top of the tank and exerted a stretching force on the bar of 41 tons per square inch. The force of the jack on the steel bar tended to stretch the steel. When it was stretched to a pre-determined limit, the nut was driven down to the anchor plate and thus the bar was held in tension. The tension was exerted against the concrete sides of the tank with a force that was translated into pressure against the top and bottom of the tank walls. * * *

\*        \*        \*        \*        \*        \*        \*

It has been said above that the function of the bars was to "pre-stress" the concrete walls in which they were used. The witness stated that the prestress principle was employed through the use of these bars to enable the concrete tank

walls to withstand greater than normal force. Concrete is strong in compression but weak in tension. When these bars were stressed, in the manner described above, they exert a compressive force on the concrete approximately equal to the tension applied to them by the hydraulic jack. * * *

The jack actually stretched the bar. When the nut is tightened against the anchor plate and the jack is released, the force that was being held by the jack is transferred to the anchorage on the upper end of the bar and the concrete walls are literally compressed and thus are strengthened. The application of these forces in the manner described above enables the builders to construct a tank of a given strength and capacity with 50% less concrete and 75% less steel than would be required if the standard inert reinforcing bars were used. * * * These pre-stressed bars differ radically from standard reinforcing bars. The latter are deformed to insure their bonding with the concrete. Pre-stressed bars are coated with mastic and covered with paper to protect them against bonding and to enable them to move within the concrete when the force of the jack is applied. The minimum breaking strength of the Macalloy bars is 145,000 pounds per square inch. The mild steel in concrete reinforcing bars has a breaking point of 80,000 pounds per square inch. A 10 foot bar of mild steel, stretched to its maximum point would yield only ⅛ inch. The compressive force which it exerts on the concrete would be lost if the concrete shrunk ⅛ inch, which it does. A 10 foot Macalloy reinforcing bar, on the other hand, having superior strength could be stretched approximately ¾ of an inch. If the concrete shrunk ⅛ inch, there would be no appreciable diminishing of the compressive force of the steel and the concrete, would not, under the proper circumstances shrink ¾ inch. This demonstrates that the Macalloy bars are designed to withstand the tension applied to it by the hydraulic jack and to exert a corresponding force on the concrete. Ordinary steel bars could not be put to such purposes. * * *

The foregoing evidence was introduced in an effort to establish that the so-called Macalloy bars carry maximum loads with a minimum use of materials and are, in fact, structural shapes within the contemplation of paragraph 312, *supra.*

Further evidence was introduced at a subsequent hearing of the case in New York, which will be referred to, *infra.* Concerning plaintiffs' contention that the bars in controversy are structural shapes, as that term has been interpreted by the courts, we deem it appropriate here to observe that, in our view of the issues involved in this case, a determination of that question is unnecessary.

Plaintiffs have advanced the alternative contention that the subject merchandise falls within the provisions of paragraph 304 for concrete reinforcement bars. Assuming *arguendo* that the merchandise is covered by both paragraph 304 and paragraph 312, although both are use provisions, the former is also a designation by name and is, therefore, controlling.

At the time of granting the amendments to the protests above referred to, defendant's request that the case be restored to the calendar for all purposes was granted and, at New York, a third witness testified on behalf of plaintiffs and one witness appeared for the defendant.

Plaintiffs' third witness was Morris Schupack, chief engineer of the Preload Co. for the past 3 years. He stated he had a bachelor of civil engineering degree and had approximately 11 years' experience in various forms of construction, including the use of concrete reinforcement bars. In his experience, he had used prestressed concrete bars and nuts in connection therewith, as illustrated by exhibit 1.

With the photograph, exhibit 7, before him, this witness explained the functioning of the prestressed concrete reinforcement bar, which was corroborative of the testimony previously given by plaintiffs' witness Magers, and testified as to the use of the nuts and washers, stating that—

* * * After the tension is applied and the proper elongation is achieved this nut which is underneath the adapter is turned home. And this, having a special thread, it is necessary that the end of the nut lines up with the end of the thread to develop the full strength of the bar. When that is done and it is found that there is clearance because of practical limitations in accuracy, between the bottom nut and the plate, washers are inserted to lock the nut against the plate and it is necessary to—that is before the jack is released. It is necessary to lock the nut against the plate before the jack is released. And as the jack is released the full tension in the bar is imparted, is released from the jack, and compression is produced in the concrete. * * *

At the direction of the court, Schupack indicated on exhibit 7 where the nut and washers appear. The witness testified that there are two half washers used so that they may be inserted from both sides. In addition to the split washers, round washers are also employed, the round washers giving "a bit better bearing over the hole," the split washers being used to adjust the closure due to construction tolerances. He testified that the washers are made of steel.

Schupack stated that the nuts and split washers were particularly adopted for use with the imported concrete reinforcement bars and not for general use, but that the round washers could be put to other purposes.

When asked by the bench, "Concerning a reinforced concrete structure, is it the steel that reinforces the concrete or does the concrete reinforce the steel?" the witness replied, "It's the steel that reinforces the concrete," and added that this is the main purpose of concrete reinforcement bars.

Defendant called as its witness in rebuttal Eric L. Erickson, chief of the Bridge Branch of the Bureau of Public Roads in the United States Department of Commerce, who was well informed on the subject of concrete reinforcement. It appears that his testimony was introduced primarily in an effort to prove that the Macalloy bars are not concrete reinforcement bars within the purview of that term as appears in paragraph 304. This claim is based largely upon the contention that the bars in controversy differ in method of use and composition from concrete reinforcement bars.

Erickson testified that the American Society for Testing Materials has specifications for the material to be used in their construction; that there are three grades of hot-rolled carbon steel which is the most commonly used type, recognized as structural grade, intermediate grade, and hard grade, whereas the Macalloy bar is an alloy steel, hot-rolled, then "cold worked to build up its tensile properties."

Erickson stated, in substance, that a prestressing bar puts compression on the concrete itself; that, in his opinion, ordinary reinforcement bars made according to A. S. T. M. specifications are not interchangeable with prestressing bars, and that a prestressing bar, such as exhibit 1, would not ordinarily be used to reinforce concrete; that the compression created by the prestressing equipment causes the concrete itself to carry the load; that "In normal reinforced concrete the concrete takes the compressive forces and the steel takes the tensile forces."

Erickson further testified as follows:

Q. So that after the normal load or cracking occurs in reinforced concrete the reinforcement bar itself takes the tensile load, is that correct?—A. That's correct.

When asked for his opinion as to the difference between an ordinary concrete reinforcing bar and a prestressing bar, the witness replied:

A. The principal difference is in the strength of the material, the tensile strength of the material, since a high tensile strength is required in the case of practical prestressment. * * *

Q. * * * Are they used in the same manner?—A. The application is different.

We gather from the foregoing testimony that deformed bars and the Macalloy bars are both used to reinforce concrete, but by different methods of operation.

It is significant, we believe, as stated by plaintiffs in their supplemental brief, that—

* * * These [Macalloy] bars have replaced ordinary concrete reinforcing bars because, they can be used to make a better structure with about one-quarter of the amount of steel that would be required to impart the requisite strength if ordinary deformed reinforcing bars were used.

Further, plaintiffs' brief states:

Responding to the questions by Judge Lawrence, the witness stated that deformed bars are used to give greater strength to concrete and prestressed steel bars are used for the same purpose, but the principle by which the concrete is reinforced is different in each instance. * * *

The record discloses that deformed bars and Macalloy bars differ in the type of steel used in each, one being a carbon steel, the other an alloy steel. However, it appears to us that the Macalloy bars are an advanced type of concrete reinforcement bars, both performing a similar service, but, as above pointed out, the Macalloy bars are

so constructed and utilized as to result in a very substantial saving of steel and concrete in the construction of tanks, bridges, *et cetera*.

A case having an important bearing on the determination of the present controversy is that of *United States* v. *Henry L. Exstein Co.*, *Inc.*, 16 Ct. Cust. Appls. 328, T. D. 43079. It is deemed pertinent to quote from the opinion of the court in that case the following description of the so-called deformed steel bars there under consideration:

The imported material consisted of bars made from new billet steel, in part, approximately 1⅛ inches square and 60 feet in length, and in part of round bars, 40 feet in length and three-eighths and one-half inch in diameter. These bars were rolled and conformed to the standards established by the American Society for Testing Materials. Upon their respective surfaces were ridges and protuberances so placed and spaced as to make them suitable for holding when embedded in concrete construction. They were completely manufactured. The principal use of this material, as shown by the testimony, was for reinforcement for concrete. A minor use of the same is shown by the record for making ornamental grill and other iron work, but it is not contended that this is a major, or even an important, use of the product. It is not used for forging or machine work because of its deformations. It is also disclosed by the evidence that this material is used in conjunction with concrete in making floors, conduits, bridges, walls, and, in fact, practically every structure where concrete is used. The testimony further discloses that where used in a building, the plans and specifications prepared by the engineer or architect specify the location, size, and strength of such reinforcing material, and that when so used, the ends of the bars are usually bent in such a form that they can be anchored by means of stirrups, or otherwise, to the wall columns or laterals of the building, and, after having been so placed, are surrounded with concrete and become a permanent part of the building, and can not be removed without endangering the stability and strength thereof. It is further shown that these are used in all buildings of steel construction, wherever concrete work is needed, and are also used as a reinforcement in concrete buildings or structures where no steel framework is used. The bending of the ends for attachment to the other members of the building is done by workmen, usually in the progress of construction; when this material is imported it is straight, without any such finishing. When a structure in which such material is used is completed, the said material assists in carrying both the dead and live loads of the building, has the capacity to resist great tension and compression, contributes to the stability of the structure, and becomes an integral part of the skeleton of the same. The imported material has not been assembled, manufactured, or advanced beyond hammering, rolling, or casting.

The only question for our decision is whether the court below erred in holding, under this proof, that said material constitutes "structural shapes" of steel.

We incline to the view there was no error in so holding. * * *

The *Exstein* case, *supra*, was decided in 1928 and the deformed steel bars in that case were held to be properly classifiable as structural shapes of iron or steel in paragraph 312 of the Tariff Act of 1922, which corresponds in all material respects to paragraph 312 of the Tariff Act of 1930. However, when H. R. 2667, which later became the Tariff Act of June 17, 1930, was under consideration, the attention of Congress was invited to the *Exstein* decision by the United States

Tariff Commission in the Summary of Tariff Information, 1929, volume 1, page 655, which was prepared for the use of Congress.

At the hearings before the House Ways and Means Committee, various American manufacturers appeared, testified, and submitted briefs on the subject of concrete reinforcing bars. The brief of the Concrete Reinforcing Steel Institute, quoted in volume 3, schedule 3, of said hearings, page 1891, specifically cited the *Exstein* case and requested a separate rate of duty for such bars in paragraph 304.

It is significant that Congress, in enacting paragraph 304 in the Tariff Act of 1930, specifically provided for concrete reinforcement bars. This, we believe, indicates a clear intention on the part of Congress to remove concrete reinforcement bars from the class of structural shapes provided for in paragraph 312 and, as we view it, presents a compelling reason for holding that the Macalloy bars, without the nuts and washers, should be classified in paragraph 304 of said act, as modified, *supra*, as concrete reinforcement bars and subjected to duty at the appropriate rate provided therefor.

While the nuts and washers which accompanied the bars may have been specially designed for use with the bars, they did not lose their identity as nuts and washers and become merged in an article having a new name, character, and use. The nuts and both types of washers at all times retained their individual identity. Therefore, we find and hold that said articles should not be classified with the bars as entireties. Inasmuch as the record discloses that the nuts and washers are composed of steel, they come within the *eo nomine* provision therefor in paragraph 330.

Upon the record and for the foregoing reasons, we find that the bars in controversy (without the nuts and washers) are properly classifiable for tariff purposes in paragraph 304 of said act, as modified by the Annecy Protocol to the General Agreement on Tariffs and Trade (84 Treas. Dec. 403, T. D. 52373), supplemented by Presidential proclamation (85 Treas. Dec. 116, T. D. 52462), and dutiable at the rate of 12½ per centum ad valorem.

However, in examining the official papers herein, we find that three of the protests (206225-7-K) have amended claims that the importations are dutiable at 12½ per centum ad valorem in paragraph 304, pursuant to Presidential notification supplementing the Torquay protocol (86 Treas. Dec. 265, T. D. 52763). By reference to said T. D. 52763, it appears that the 12½ per centum ad valorem rate of duty therein provided relates to concrete reinforcement bars, *inter alia*, valued over 16 cents per pound, whereas it appears from the entry papers herein that the importations were "valued over 5¢ and not over 8¢ a lb."

It is noted that the Annecy protocol and Presidential proclamation thereto, *supra*, grant to concrete reinforcement bars, valued above 5

and not above 8 cents per pound, the rate claimed in the amendments to the above three protests, namely, 12½ per centum ad valorem. In passing, it may be observed that neither in the testimonial record nor in the briefs of the parties to this action is any reference made to the sliding scale of rates of duty applicable to concrete reinforcement bars in paragraph 304 based upon value. Inasmuch, however, as plaintiffs have invoked said paragraph 304 and named the particular item—concrete reinforcement bars—and the correct rate of duty which is provided by the Annecy protocol and Presidential proclamation, *supra*, we deem the protests sufficient to justify a judgment sustaining protests 206225–7–K. Citing *Wm. Dixon, Inc.* v. *United States*, 28 Cust. Ct. 407, Abstract 56415, *Loblaw Groceterias, Inc.* v. *United States*, 22 C. C. P. A. (Customs) 479, T. D. 47481, and cases referred to therein.

The initial protest herein (206224–K), by amendment, invokes paragraph 304 but claims that the importation should be classified as concrete reinforcement bars and assessed with duty at the rate of 15 per centum ad valorem, citing the General Agreement on Tariffs and Trade (82 Treas. Dec. 305, T. D. 51802).

Thus, it will appear from the foregoing that, beginning with said T. D. 51802, paragraph 304, with special reference to concrete reinforcement bars, has been modified at least three times.

It is observed that the General Agreement on Tariffs and Trade, like the Torquay protocol, specifies a rate of duty applicable to concrete reinforcement bars, valued over 16 cents per pound. Hence, the proper rate of duty on the bars covered by protest 206224–K is 12½ per centum ad valorem, by virtue of the Annecy protocol and Presidential proclamation thereto, since the shipment in controversy was valued above 5 and not above 8 cents per pound.

It will be seen that, as to protest 206224–K, plaintiffs cited the correct paragraph for concrete reinforcement bars, but specified the wrong rate of duty and, as in the other three protests, cited the wrong trade agreement.

While it is fundamental that a protest must bring to the attention of the collector the objection which is in the mind of the plaintiff, nevertheless, as stated by the Supreme Court of the United States, in *Arthur* v. *Morgan*, 112 U. S. 495—

* * * A protest is not required to be made with technical precision, but is sufficient if it shows fairly that the objection afterwards made at the trial was in the mind of the party and was brought to the knowledge of the collector, so as to secure to the government the practical advantage which the statute was designed to secure. * * *

In the circumstances of protest 206224–K, we are concerned with an amendment of a protest which, of course, was not reviewed by the collector and it would seem, therefore, that the question for us to

determine is whether the amended claim adequately brings to the attention of the court the objection which was in the mind of the plaintiffs when filing the motion to amend. .

Bearing in mind that the four protests herein were consolidated for trial and that the merchandise is the same in each of the importations, it is believed that the ends of justice are subserved by treating all of the protests as sufficient to permit the entry of a judgment directing the collector to reliquidate the entries pursuant to the provisions of paragraph 304, as modified, *supra*, at the appropriate rate depending upon value, which is 12½ per centum ad valorem.

One might inquire why the initial protest cites the General Agreement on Tariffs and Trade (T. D. 51802) and a rate of 15 per centum ad valorem, while the other three protests cite the Presidential notification supplementing the Torquay protocol (T. D. 52763) and invoke duty at the rate of 12½ per centum ad valorem. A possible answer to this rests in the fact that, at the time the entry was made to which protest 206224–K relates, the particular provision in the Torquay protocol had not been made effective, whereas the Presidential proclamation to the Annecy protocol (T. D. 52462) was in effect but was evidently overlooked, which doubtless may account for the clerical oversight.

Reference has been made, *supra*, to the fact that, as to the nuts and washers covered by three of the protests involved herein (206225–K, 206226–K, and 206227–K), it is alternatively claimed that said articles are dutiable at three-tenths of 1 cent per pound in paragraph 330, as modified by the Torquay protocol, as supplemented by Presidential notification, T. D. 52763, *supra*.

The provision in paragraph 330 for nuts and washers of wrought iron or steel was modified by the General Agreement on Tariffs and Trade, *supra*, to provide the rate of duty claimed of three-tenths of 1 cent per pound and has not been subsequently modified by later protocols thereto. The inaccuracy in citing an incorrect modification in support of plaintiffs' proper claim of the correct paragraph, provision thereof, and rate does not invalidate their claim. See *Wm. Dixon, Inc.* v. *United States, supra.*

In conclusion, we hold that the bars covered by the four protests enumerated in the schedule of protests, attached to and made part of our decision herein, should be classified as concrete reinforcement bars, valued above 5 and not above 8 cents per pound, in paragraph 304 of the Tariff Act of 1930, as modified by the Annecy protocol and Presidential proclamation thereto, *supra*, and subjected to duty at the rate of 12½ per centum ad valorem, plus additional duty of 4 per centum ad valorem by reason of the presence of silicon in excess of 1 per centum, pursuant to the provisions of paragraph 305 (1) of said act

(19 U. S. C. § 1001, par. 305 (1)), as modified by the General Agreement on Tariffs and Trade, *supra*, as shown by the record, and that the nuts and washers are properly classifiable within the *eo nomine* provision therefor in paragraph 330 of said act, as modified by the General Agreement on Tariffs and Trade, *supra*, for which duty at the rate of three-tenths of 1 cent per pound is provided, as alternatively claimed by plaintiffs. To that extent, the protests are sustained and judgment will issue accordingly.