(C.D. 2558)

CARSON M. SIMON & CO. *v.* UNITED STATES

United States Customs Court, First Division

(Decided July 26, 1965)

*Tompkins & Tompkins* (*Allerton deC. Tompkins* of counsel) for the plaintiff.
*John W. Douglas*, Assistant Attorney General (*Mollie Strum, Daniel I. Auster*, and *Charles P. Deem*, trial attorneys), for the defendant.

Before WILSON and NICHOLS, Judges; OLIVER, J., not participating

NICHOLS, Judge: The merchandise involved in this case consists of rush bags or baskets and maize or corn husk bags or baskets. The articles were imported from Yugoslavia on various dates between September 15, 1954, and November 9, 1955, inclusive. They were assessed with duty at 25 per centum ad valorem under paragraph 411 of the Tariff Act of 1930, as modified by the General Agreement on Tariffs and Trade, T.D. 51802, by virtue of the similitude clause in paragraph 1559, as amended by the Customs Simplification Act of 1954, T.D. 53599, as baskets and bags, wholly or in chief value of straw, not specially provided for. It is claimed in the protest that the merchandise is dutiable at 11½ per centum or 12½ per centum under paragraph 1537(a), or 10 per centum under paragraph 1558, or 19 per centum or 20 per centum under paragraph 1023 of the Tariff Act of 1930, as modified. At the trial, it was stated that the claims were that the articles were dutiable as manufactures of weeds or in chief value of weeds under paragraph 1537(a), as modified, at 12½ per centum ad valorem, or as manufactures of vegetable fiber under paragraph 1023, as modified, at 20 per centum ad valorem, or as nonenumerated manufactured articles under paragraph 1558, as modified, at 10 per centum ad valorem.

The pertinent provisions of the tariff act, as modified, are as follows:

Paragraph 411, as modified by the General Agreement on Tariffs and Trade, T.D. 51802:

Baskets and bags, wholly or in chief value of straw, not specially provided for_____ 25% ad val.

Paragraph 1559(a), as amended by the Customs Simplification Act of 1954 (effective October 1, 1954):

Each and every imported article, not enumerated in this Act, which is similar in the use to which it may be applied to any article enumerated in this Act as chargeable with duty, shall be subject to the same rate of duty as the enumerated article which it most resembles in the particular before mentioned; and if any nonenumerated article equally resembles in that particular two or more enumerated articles on which different rates of duty are chargeable, it shall be subject to the rate of duty applicable to that one of such two or more articles which it most resembles in respect of the materials of which it is composed.

Paragraph 1537(a), Tariff Act of 1930:

Manufactures of bone, chip, grass, sea grass, horn, quills, palm leaf, straw, weeds, or whalebone, or of which these substances or any of them is the component material of chief value, not specially provided for, 25 per centum ad valorem * * *.

Paragraph 1537(a), as modified by the Protocol of Terms of Accession by Japan to the General Agreement on Tariffs and Trade, T.D. 53865, effective September 10, 1955, T.D. 53877:

Manufactures of bone, chip, grass, sea grass, horn, straw, or weeds, or of which these substances or any of them, or a combination of these substances or any of them with quills, palm leaf, or whalebone, is the component material of chief value, not specially provided for:

&ast; &ast; &ast; &ast; &ast; &ast; &ast;

Other _____ 12½% ad val.

Paragraph 1023, as modified by the General Agreement on Tariffs and Trade, T.D. 51802:

All manufactures, wholly or in chief value of vegetable fiber, except cotton, not specially provided for_____ 20% ad val.

No mention of the claim under paragraph 1558 is made in plaintiff's brief, and it has apparently been abandoned.

At the trial, plaintiff introduced into evidence a sample representing the items identified or described on the invoices as rush bags or baskets (plaintiff's exhibit 1) and a sample representing the items described on the invoices as maize bags or baskets and identified by the examiner as corn husk bags or baskets (plaintiff's exhibit 2). Both items are bags or baskets with handles, of the type known as tote bags, the body portion measuring approximately 15 by 8½ by 4½ inches.

Frederick Otto Merz, chief partner and general manager of the importing firm, testified that he has personally bought these bags for many years. He had visited Yugoslavia about 12 or 13 times in the course of that many years and had seen such bags being made both there and in Italy. Exhibit 1 is made of bulrushes or rushes and exhibit 2 from the husks around the ears of fodder corn. Bulrushes are prepared for use as follows:

The stalks are first dried. Then they are tied in bundles and shipped to the areas where they make the baskets. There they are stored until they are needed. They are cut in certain lengths and when they are used, they are spliced. They use a knife especially the center stems, spliced up in many more thinner pieces, and the day before they are actually woven, they are soaked in water, as the girls work, they have a bucket of water standing alongside of them and the pieces must be dripping wet while they work.

The entire stalk of the bulrush, including the portion which grows under water, the stem, and the leaves, but not the roots, are used. The pieces are cut to size and are twisted together as the bag is woven. The body of the bag is made on a hand loom, and the handle part is twisted by hand, while dripping wet. Pieces of bulrushes were received in evidence as plaintiff's illustrative exhibit 3, and photographs showing bulrushes growing, when tied in bundles for work, and being woven, were received in evidence as plaintiff's illustrative exhibits 4, 5, and 6, respectively.

Mr. Merz testified that bulrushes grow in swamps and along banks of rivers and are really just weeds. They grow very profusely and choke out all other vegetation and interfere with plant and fish life.

They are never cultivated but grow wild. The plant is unsightly and becomes smelly after it gets old and decays. When it grows in a park, it is cut twice a year and burned.

The witness described the method of manufacture of baskets like exhibit 2 as follows:

They husk the corn in a similar way we do it here and the husks are thrown in a pile and the women that make the basket go through this pile of husks and pick out the clean parts of it, dry it, and then take it home, store it away until they use it. They are usually cut in lengths of about 4 or 5 inches. Here again they are soaked in water for the purpose of weaving. They are also very wet when they weave the baskets.

Both the rush bags like exhibit 1 and the maize bags like exhibit 2 are woven on frames which are taken out when the bags are completed. A model consisting of a frame with a bag like exhibit 2 thereon was received in evidence as plaintiff's illustrative exhibit 8, and a piece of corn husk taken from the model as plaintiff's illustrative exhibit 7.

Mr. Merz testified that his firm imports bags and baskets made of maize and rush, and also of willow and straw. Willow baskets are handmade and are not made on a frame. Straw baskets are made in several different ways, including braiding, weaving, and crocheting. Sometimes straw fabric is made and cut and sewn to form baskets, whereas exhibits 1 ad 2 are woven in one unit. The witness explained:

The braiding of straw or the weaving of straw is a different craft. It is done in a different area, in different parts of the country. I have never seen them use forms, for instance, I have never seen them make a straw bag over a form. As far as I have seen, it is always made free-hand and there are many many different ways of weaving straw. There are many many different kinds of straw, and straw, they split straw as fine as a hair for some purposes.

Straw is not soaked to make it soft and pliable as bulrush is, nor is it woven wet. It is usually bleached or dyed, but exhibits 1 and 2 are in their natural color.

Maize and rush are heavy and uneven materials, whereas straw is always of the same thickness. A sheaf of straw is round and stick-like, while rush and maize are almost flat leaves. The pieces used in exhibits 1 and 2 have been cut down to size, but, in making straw baskets, the full sheaf, except the ear, is used. Straw cannot be twisted as rush and maize can be. Straw does not wear as well because it becomes very brittle when it dries. Therefore, bulrush and maize bags have two or three times the life of straw bags. Straw and rush or maize bags feel different and look different and are of a different texture. Straw is a more valuable material than rush, but the value of the bag depends upon the work that is put into it.

Straw bags can be made in the same size and style as exhibits 1 and 2. Although made differently, when they become bags, they are sim· ilar and have a similar appearance. They are used for the same

purpose and are sold in the same shops to the same class of people. They are sold as toters—exhibits 1 and 2 as rush or maize toters, and straw bags as straw toters.

Before discussing the merits of plaintiff's contentions, it is necessary to pass upon a preliminary question which has been raised in defendant's brief, namely, that the protest is insufficient to support the claim that the merchandise is classifiable as manufactures of weeds, directly or by similitude, because incorrect or inapplicable rates are cited.

It is well settled that a protest may be amended to include a new claim as to merchandise covered by the original protest. *United States* v. *Weigert-Dagen et al.*, 39 CCPA 58, 61, C.A.D. 464. The rules of this court provide that a party may amend his protest at any time by leave of the court and that such leave shall be freely given when justice so requires. (Rules of the United States Customs Court, rule 6(c).) Under this rule, a motion may be granted allowing an amendment when a case is called for trial. *Washington State Liquor Control Board* v. *United States*, 26 Cust. Ct. 147, C.D. 1316; *Shell Oil Co., Inc., et al.* v. *United States*, 32 Cust. Ct. 438, Abstract 57957; *Atlas Trading Co.* v. *United States*, 35 Cust. Ct. 146, C.D. 1736.

The protest here could have been amended at the trial and might well have been, had plaintiff's attention been called to the alleged defect. Concededly, the court had jurisdiction. Counsel stated the claim in open court and presented proof in support thereof, without any objection being made by counsel for the Government. That issue has been raised for the first time in the Government's brief. Under these circumstances, we find that the objection, even if valid if timely made, was, in fact, not seasonably made, and that submission of the case on its merits constituted an implied waiver of the defects, if any, in the protest. *Shell Oil Co.* v. *United States*, 54 Cust. Ct. 64, C.D. 2509; *Langfelder, Homma & Hayward, Inc.* v. *United States*, 2 Cust. Ct. 525, Abstract 40344.

Defendant asserts the collector would have thought the claim was that the merchandise consisted of raffia, which is a product of the palm. He would have come to this conclusion because only raffia fitted the rates claimed. But the protest says it relates to "certain maize or rush articles." The argument is either frivolous or is entirely too subtle for the comprehension of a commercial court.

"When the importer has selected the right paragraph, although confining the claim to the wrong clause in the paragraph, the courts have held that the protest was sufficiently specific to apprise the collector of what the importer was claiming." *Pacific Customs Brokerage Company* v. *United States*, 33 Cust. Ct. 302, Abstract 58229. Acc: *Needler's British Imports* v. *United States*, 39 Cust. Ct. 321, Ab-

stract 60926; *Preload Construction Corp. et al.* v. *United States*, 38 Cust. Ct. 60, C.D. 1844; *John H. Frankenberg* v. *United States*, 13 Cust. Ct. 123 C.D. 882.

Quite obviously manufactures of rush or maize are not manufactures of raffia. In view of the description of the articles in the protest and the fact that there were different dates of entry when different rates were in effect, the collector could not reasonably confine his review to deciding the frivolous issue whether the articles were classifiable as manufactures of raffia, directly or by similitude, but was called upon to examine the 12½ per centum provision in the Japanese Trade Agreement, which covered, *inter alia*, manufactures of grass, sea grass, or weeds. The protest sets out broad alternate claims under several paragraphs. It is the opposite of *Raybestos Manhattan, Inc.* v. *United States*, 27 CCPA 340, C.A.D. 109, cited by defendant, where the attention of the collector was directed to a distinct claim only, the merchandise being described in the protest only as metacresol, which was *eo nomine* provided for in the paragraph cited, and only at trial did plaintiff claim it was something else. Under those circumstances, it was held that the collector had a right to limit his consideration to a claim that the merchandise was metacresol, and not to ascertain whether it was cresylic acid.

We hold that the general claim under paragraph 1537(a) is sufficient to bring before the court the issue of whether certain of the merchandise is properly classifiable under that paragraph as manufactures of weeds, directly or by similitude. However, since entries 423, 3669, 17571, and 6685 were made before the effective date of the Japanese Trade Agreement, the applicable rate as to them (if the claimed classification be correct) would be 25 per centum, the same as the assessed rate. Inasmuch as the protest states that claims are made only if the rate is lower than that assessed and as the court could not grant any effectual relief under the claim as to those entries, the protest must be dismissed to that extent.

The claim as to classification as manufactures of weeds is thus limited to the merchandise covered by entries 4766 and 7632.

Plaintiff contends that the rush articles are classifiable as manufactures of weeds on the basis of various dictionary definitions of the term "weed" and the testimony of Mr. Merz. Defendant claims that—

* * * the ascertainment of whether or not any particular plant growth can properly be termed weeds depends not on whether it grows profusely, or is unsightly, or grows in the wild, or is not cultivated, or is malodorous when rotting, but on whether it is actually, rather than merely potentially, objectionable and that the application of this criterion to the case at bar can lead the Court to but one conclusion, viz., that the instant rush bags have not been shown to have been manufactured from weeds. [Defendant's brief, p. 12.]

Defendant quotes the Standard Cyclopedia of Horticulture, 1917 edition, volume 6, page 3510, as follows:

A weed is a plant that is not wanted. There are therefore, no species of weeds, for a plant that is a weed in one place may not be in another. There are, of course, species that are habitual weeds; but in a wild state, where they do not intrude on cultivated areas, they can scarcely be called weeds.

Defendant, in giving sanction to this as the controlling definition of "weed," suggests a fascinating picture of our dedicated customs agents deep in the malarious swamps of Eastern Europe, polling the inhabitants, if any, to determine whether the local bulrushes are "wanted" by them or not. No customs officer could classify a bag simply by observing it was made of rushes. Did the Congress really demand such a result? "That construction of a tariff statute which will render duties uniform upon uniform classes and kinds of goods is greatly to be desired [,] must be assumed to have been the Congressional purpose and should not be denied save for cogent and clearly convincing reasons." *United States* v. *Wolff & Co.*, 5 Ct. Cust. Appls. 418, 419, T.D. 34943. Anomalies must be avoided. *Davies, Turner & Co.* v. *United States*, 13 Cust. Ct. 190, 201, C.D. 893. In light of these authorities, this court should determine, if it can, that, for the purposes of paragraph 1537(a), bulrushes and other rushes, all of them, either are weeds or they are not. And it can.

Provision for manufactures of weeds was first made by the Tariff Act of 1890 and has been included in all subsequent tariff acts in paragraphs similar to the one before the court. (Paragraph 460, act of 1890; paragraph 352, act of 1894; paragraph 449, act of 1897; paragraph 463, act of 1909; paragraph 368, act of 1913; paragraph 1439, act of 1922.) Summaries of Tariff Information give statistics on importations classified as manufactures of weeds, but do not discuss what is meant by the term. Summary of Tariff Information, 1921, page 1180; Summary of Tariff Information, 1929, page 2079. The Summaries of Tariff Information, 1948, states (vol. 15, part 7, p. 31):

\* \* \* Manufactures of weeds have been unimportant and probably have consisted of novelties and curios.

The term "weeds" is also found in the drug paragraphs (paragraph 34 and paragraph 1669 of the Tariff Act of 1930 and their predecessors), presumably to cover such weeds as have medicinal properties.

Since tariff acts are not drafted in terms of botany or science but in the language of commerce which is presumptively that in common use, and no commercial designation having been claimed, the issue here is the common meaning of the term "weed." *Maltus & Ware* v. *United States*, 6 Ct. Cust. Appls. 376, T.D. 35920; *United States* v. *C. J. Tower & Sons of Buffalo, N.Y.*, 48 CCPA 87, C.A.D. 770; *Transcontinental Seed, Inc., et al.* v. *United States*, 29 Cust. Ct. 163, C.D. 1462; *Chester K. Stoner* v. *United States*, 42 Cust. Ct. 178, C.D. 2083; *Wing Coffee Co., Ltd., et al.* v. *United States*, 53 Cust. Ct. 60, C.D. 2473. Common meaning is a question of law to be determined

by the court. *United States* v. *Mercantil Distribuidora, S. A., et al.,* 43 CCPA 111, C.A.D. 617. The court may take testimony on the question and may resort to and use dictionaries, textbooks, scientific treatises, and governmental publications as aids in arriving at its conclusion. *United States* v. *Victoria Gin Co., Inc., et al.,* 48 CCPA 33, C.A.D. 759.

In making our determination in the instant case, we have consulted a number of authorities including The New International Encyclopaedia; The Encyclopedia Americana; Collier's Encyclopedia; Encyclopaedia Britannica; The Columbia Encyclopedia; Britannica World Language Dictionary; Funk & Wagnalls New Standard Dictionary; The New Century Dictionary; Webster's New International Dictionary; "A Manual of Weeds" by Ada E. Georgia, Assistant in the Farm Course, New York State College of Agriculture, Cornell University (1938); "Weeds" by Walter Conrad Muenscher, Professor of Botany, Emeritus, New York State College of Agriculture at Cornell University (second edition, 1955); "Just Weeds" by Edwin Rollin Spencer, Ph. D., Professor of Biology at McKendree College (1940).

Many of these authorities state that, strictly speaking, there are no species of weeds and that whether or not a given plant is considered a weed depends not only upon its characteristics and habits but also on its relative position with reference to other plants and man.

The word weed suggests a useless, ugly or harmful plant that persists in growing where it is not wanted. Many weeds possess one or more, but not necessarily all, of these characteristics.[1]

* * * [A bad weed] has the traits of a Bonaparte or a Hitler. Give it an inch and it will take a mile, all because nature has endowed it with supervitality as well as with a few characteristics that make it useless to man and beast.[2]

Popularly, the term "weeds" is a name for wild plants, especially for those which grow where they are not wanted. Such plants thrive under adverse conditions; they reproduce freely; they have an enormous number of seeds which are easily and widely disseminated; they are usually undesirable, unsightly, troublesome, and profuse; they choke out crops; some are noxious or injurious to other vegetation, but some have valuable medicinal properties. There are some 600-odd species of weeds common to North America. The original edition of "Weeds," op. cit., contains a description of 500 weeds of the northern United States and Canada and 71 have been added to the second edition. The works by Georgia and Spencer also list and describe large numbers of plants known as weeds.

In Webster's New International Dictionary (1953 ed., unabridged) the preferred definition is "Wild growth in the nature of rank grass,

[1] Muenscher, op. cit., p. 3.
[2] Spencer, op. cit., p. 1.

undergrowth, etc." and only secondarily, "Any plant growing in ground that is or has been in cultivation, usually to the detriment of the crop or to the disfigurement of the place * * *."

We conclude that the term "weed" is used by various writers in various ways. To some, doubtless, the concept postulates land under some form of cultivation, or at any rate subject to attempted human control of its vegetation, and a plant that by its spread and proliferation frustrates that effort. To such persons, a plant in a totally uncultivated area could not be a weed. Thus, plants such as cactus, characteristic of the uncultivated arid expanses of the southwest would not be weeds. To others, the term "weed" is more vaguely pejorative, denoting any plant of which the speaker disapproves. In the common speech of many, a plant may be called a weed for reasons other than interference with cultivation, for example, if it obstructs the navigation of a navigable stream. That a plant grows and spreads vigorously without human assistance, and that it is not highly valued, would seem here to suffice.

It would be inconsistent for the Congress to recognize the value of certain plants enough to enact an *eo nomine* provision for manufactures of them, and simultaneously to intend the term to mean only such plants which are unwanted. They would have to be wanted at least by those who use them in manufacture.

The materials used to make the imported merchandise, referred to as rush or bulrush, are "weeds" within this meaning. The witness referred to them as bulrush weed and said they grew wild in swampy places and along rivers, were unsightly, odorous, and profuse, choked out other vegetation, and interfered with fish life. The protest and the invoices refer to the material as "rush." According to the authorities cited, these two terms are used loosely to denote various grass-like plants growing in marshy places. Webster's New International Dictionary (1953 edition, unabridged) gives the following definitions:

bulrush, 1. A kind of large rush, growing in wet land or in water; esp.: a Any sedge of the genus *Scirpus*, esp. *S. lacustris;* a club rush. b In England the cattail, or reed mace *Typha latifolia* and *T. angustifolia.* c In America the common rush (*Juncus effusus*). 2. In Egypt and in Mosaic writings, the papyrus.

rush, 1. a Any of various plants of the genus *Juncus*, having cylindrical, often hollow stems; also, less correctly, any of several species of *Scirpus*. Cf. BULRUSH. Rushes are used in bottoming chairs and plaiting mats, and the pith is used in some places for wicks and rushlights. They were formerly strewn over floors.

Bulrushes are also used in making chair bottoms and mats, to fill spaces between the seams of casks, and for thatching roofs. According to The Columbia Encyclopedia, they are sometimes cultivated in aquatic gardens. They were used by the Egyptians to make the earliest form of paper. The plant can hardly be deemed, in view of its

many uses, to be always "unwanted," but we have held this is not the test.

The articles on weeds in The New International Encyclopaedia and in The Encyclopedia Americana refer to rushes and sedges as weeds. The works by Georgia and Muenscher include in their description of weeds, the common rush (*Juncus effusus*), the meadow rush, also called the dark green bulrush and the club rush (of the genus *Scirpus*) and various sedges. Spencer includes some rushes, noting that they have been used in band and rope making.

On the record presented and in view of these authorities, we conclude that rushes or bulrushes are weeds within the popular meaning of that term and as used in paragraph 1537(a), *supra*, whatever the degree of approval or disapproval extended towards them by the people of the region where they grow. They appear to belong to the class of material covered by that paragraph and its predecessors. See, for instance, *Barham et al.* v. *United States*, 11 Ct. Cust. Appls. 536, T.D. 39679, where it was held that merchandise, made from material referred to as sea grass, sedge, rush, or grass, was properly classifiable as manufactures of grass under paragraph 368 of the Tariff Act of 1913.

We hold, therefore, that the rush bags covered by entry No. 4766 are properly dutiable at 12½ per centum ad valorem under paragraph 1537(a), *supra*, as modified, as manufactures of weeds, not specially provided for. Since the articles are enumerated under a general provision of the tariff act, they cannot be classified by similitude to straw, as assessed. *Package Machinery Co.* v. *United States*, 41 CCPA 63, C.A.D. 530.

Plaintiff claims next that the corn husk or maize bags covered by entry No. 7632 are dutiable by similitude to rush bags, as manufactures of weeds, on the ground that they are similar in use to both straw bags and rush bags but are more similar in material to rush bags. Under paragraph 1559(a) of the Tariff Act of 1930, as amended by the Customs Simplification Act of 1954, *supra*, where an article equally resembles two or more enumerated articles in use, it is classifiable by similitude to the article it most resembles in material. *S. S. Kresge Co. et al.* v. *United States*, 46 CCPA 100, C.A.D. 707; *Ignaz Strauss & Co., Inc., et al.* v. *United States*, 45 Cust. Ct. 161, C.D. 2218; *Universal Foreign Service et al.* v. *United States*, 46 Cust. Ct. 258, C.D. 2266; *Border Brokerage Co.* v. *United States*, 51 Cust. Ct. 247, Abstract 68090.

The uncontradicted evidence in the instant case is to the effect that straw bags, maize bags, and rush bags are used for the same purposes and are sold in the same shops to the same class of people. They are sold as toters or totebags. Although no straw bags have been put in evidence, it is a matter of common knowledge that straw bags

of the same type as exhibits 1 and 2 have the same uses. Since maize bags equally resemble in use straw bags and rush bags, the issue to be determined is which they most closely resemble in respect of the materials of which they are composed.

On this point, we think the record establishes that maize or corn husk material resembles rush material more closely than straw material. Maize and rush are heavy and uneven materials, are almost flat leaves, can be twisted, must be soaked to be manipulated, and last two or three times longer than straw. Straw is of the same thickness, is round and stick-like, cannot be twisted, and does not have to be soaked while being woven. Straw, in fact, can be manipulated by more methods than either rush or maize can be. We hold, therefore, that the maize bags covered by entry No. 7632 are properly dutiable by similitude to manufactures of weeds under paragraph 1537(a), *supra*.

Plaintiff's alternate claim for classification under paragraph 1023, *supra*, as manufactures of vegetable fiber is untenable since the merchandise is concededly not made from the separated fibers of maize or rush but from the whole fiber. *Barham et al.* v. *United States*, *supra*.

The protest is sustained insofar as it claims that the merchandise covered by entry No. 4766 (rush bags) is properly dutiable at 12½ per centum ad valorem under paragraph 1537(a), as modified, *supra*, as manufactures of weeds, not specially provided for, and that the merchandise covered by entry No. 7632 (maize bags) is dutiable at 12½ per centum ad valorem under said paragraph, by virtue of the similitude clause in paragraph 1559(a), as amended, *supra*. It is dismissed as to all other claims for classification under paragraph 1537(a), directly or by similitude, and is overruled as to the alternate claims. Judgment will be rendered accordingly.